12-8-00

**STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS**

**PROVIDENCE, SC.** **SUPREME COURT**

**STATE OF RHODE ISLAND**

**v.** **No. 03-27-C.A.**

**RICARDO RAMIREZ**

---

**On Appeal from Judgment of Conviction and Sentence Entered in the Superior Court of Providence County**

---

# BRIEF OF DEFENDANT-APPELLANT

George J. West, Esq., #3052
One Turks Head Place – Ste. 312
Providence, RI 02903-2215
401-861-9042

QUESTIONS PRESENTED....................4

STATEMENT OF THE CASE....................5

ARGUMENT....................14

I. MR. RAMIREZ'S CONSTITUTIONAL RIGHT TO CONFRONTATION WAS VIOLATED WHEN THE TRIAL JUSTICE ERRONEOUSLY PERMITTED THE PRIOR RECORDED TESTIMONY OF GLEN BOGAN TO BE READ TO THE JURY AND FAILED TO HAVE THE TESTIMONY STRICKEN WHEN MR. BOGAN WAS SUBSEQUENTLY AVAILABLE TO TESTIFY, BOTH OF WHICH WERE REVERSIBLE ERROR....................14

II. MR. RAMIREZ'S CONSTITUTIONAL RIGHT TO CONFRONTATION WAS VIOLATED WHEN THE TRIAL JUSTICE ADMITTED UNRELIABLE HEARSAY TESTIMONY UNDER RULE 804 (c) OF THE RHODE ISLAND RULES OF EVIDENCE .....30

III. THE TRIAL JUSTICE ERRED WHEN HE REFUSED TO PASS THE CASE AFTER RECEIVING REPORTS OF JURORS' CONCERNS FOR THEIR SAFETY ....................35

IV. SIXTH AMENDMENT VIOLATED WHERE TRIAL COURT DENIED DEFENSE REQUEST TO CALL DEFENSE WITNESS ....................36

V. IMPOSITION OF TWENTY-FIVE YEAR SENTENCING ENHANCMENT BASED ON JUDGE BASED FINDINGS VIOLATES THE DEFENDANT'S SIXTH AMENDMENT RIGHTS AND THE HOLDING IN BLAKELY....................42

CONCLUSION....................53

**Cases**


Advisory Opinion to House of Representatives, 469 A.2d 1161, 1165 (R.I. 1983) .......... 40, 41
Advisory Opinion to House of Representatives, 469 A.2d 1161, 1165-1166 (R.I. 1983) .......... 42
Almendarez-Torres v. U.S., 523 U.S. 224, 118 S. Ct. 1219, 140 L.Ed. 2d 350 (1998) .......... 45
Almendarez-Torres v. United States, 523, U.S. 224, 247 (1998) .......... 49
Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348, 147 L. E. 2d 435 (2000) .......... 42
Apprendi v. New Jersey, 530 U.S. 466, 490 (2000); .......... 49
ashington v. Texas .......... 40, 41
Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 2536 (2004) .......... 49
Chapman v. California, 386 U.S. 18, 24; 87 S.Ct. 824; 17 L.Ed.2d 705 (1968) .......... 28
Chapman v. California, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967) .......... 39
Davis v. Alaska .......... 40
Davis v. Alaska 415 U.S. at 309, 94 S. Ct. at 1107, 39 L. Ed. 2d at 349-50 .......... 40
Fahy v. Connecticut, 375 U.S. 85, 84 S. Ct. 229, 11 L. Ed. 2d 171 (1963) .......... 39
Id. .......... 21, 22, 24, 28, 32
In re Michael and Joseph A .......... 21
In re Michael and Joseph A., 552 A.2d 368, 370-71 (R.I. 1989) .......... 21
Johnson v. Palange, 406 A.2d 360 (1979) .......... 20
Jones v. United States, 526 U.S. 227, 243 n.6 (1999) .......... 49
Namet v. United States, 373 U.S. 179, 83 S. Ct. 1151, 10 L. Ed. 2d 278 (1963) .......... 39
North Carolina v. Speight, 126 S.Ct. 2977 (2006) .......... 48
Ohio v. Roberts, 448 U.S. 56, 63, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) .......... 15
Ohio v. Roberts, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 579 (1980) .......... 32
Ring v. Arizona, 536 U.S. 584, 597 n.3 (2002); .......... 49
Roberts, 448 U.S. at 74, 100 S.Ct. 2531 .......... 16
Scholl, 661 A.2d at 61 .......... 16, 33
See Idaho v. Wright, 497 U.S. 805, 817 (1990) .......... 33
Shepard v. United States, 544 U.S. ___, 125 S. Ct. 1254 (2005) .......... 49
Shepard, 125 S.Ct. at 1262 .......... 49
Sosa, 839 A.2d at 524 .......... 16, 22
State of Minnesota v. Dettman, 719 N.W. 644,655 (Minn. 2006) .......... 44
State of Minnesota v. Henderson, 70 6 N.W. 758, 761 (Minn. 2005) .......... 46
State of Minnesota v. Henderson, 706 N.W. 2d 758, 761 .......... 45
State v. Allen, 359 N.C. 425, 615 S.E. 2d 256 (2005) .......... 48
State v. Brown, 744 A.2d 831, 835 (R.I. 2000) .......... 16
State v. Brown, 744 A.2d 831, 837 (R.I. 2000) .......... 24
State v. Burke, 574 A.2d 1217, 1223 (R.I. 1990)) .......... 31
State v. Carmody, 471 A.2d 1363, 1366 (R.I. 1984) .......... 36
State v. Chiellini, 762 A.2d 450, 456 (RI 2000) .......... 47
State v. Feliciano, 206 RI Lexis 140 (Suttell, J.) .......... 34
State v. Hannagan, 473 A.2d 291, 293 (R.I. 1984) .......... 16
State v. Howard, 121 N.H. 53, 58, 426 A.2d 457, 460 (1981) .......... 41
State v. Lemon, 478 A.2d 175, 178-80 (R.I. 1984) .......... 17
State v. Lynch, 7700 A.2d 840, 847 (R.I. 2001) .......... 32
State v. Myers, 115 R.I. 583, 589-90, 350 A.2d 611, 614 (1976) .......... 40
State v. Natale, 184 N.J. 458, 482-483 (N.J. 2005) .......... 48
State v. Natale, 184 N.J. 458, 494 (N.J. 2005) .......... 51
State v. Ouimette, 298 A.2d 124, 130 (R.I. 1972) .......... 18
State v. Pari 430 A 2d. 429 (R.I. 1981) .......... 36
State v. Pari 430 A. 2d 429, 431-433 (R.I. 1981 .......... 38
State v. Prout, 115 A.2d 451, 454-56 (R.I. 1975) .......... 17
State v. Scholl, 661 A.2d 55, 58-59 (R.I. 1995) .......... 15
State v. Scholl, 661 A.2d 55, 60 (R.I. 1995) .......... 32
State v. Sosa, 839 A.2d 519, 524 (R.I. 2003) .......... 15
State v. Young, 743 A.2d 1032, 1035 (R.I. 2000) .......... 36
U.S. Supreme Court in Blakely v. Washington 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004) .......... 42
United States v. Booker ___U.S.____, 125 S.Ct. 738, 756 (2005) .......... 49

United States v. Booker 543 U.S. 220, 244, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005)........ 44
United States v. Mann, 590 F.2d 361, 368 (1st Cir. 1978)........ 24
Washington v. Recuenco __ U.S.__ 126 S.Ct. 2546, 165 L.Ed. 2d 466 (2006)........ 44
Washington v. Recuenco, U.S. 126 S.Ct. 2546, 165 L.Ed. 2d 466 (2006)........ 48
Washington v. Texas........ 41
Washington v. Texas 388 U. S. 14, 87 S.Ct. 1920, 18 L. Ed. 2d 1019 (1967)........ 38
Washington v. Texas, 388 U.S. at 19, 87 S. Ct. at 1923, 18 L. Ed. 2d at 1023........ 41

**Statutes**

Minnesota Statute § 609.1095........ 53
R.I. R. Evid. 201(a)........ 20
R.I. R. Evid. 201(b)........ 20
R.I. Gen. Laws §12- 19-21........ 43
R.I. Gen. Laws § 11-23-1........ 46
R.I. Gen. Laws §12-19-21........ 46
Rhode Island General Laws § 1219-21........ 53
State v. Natale, 184 N.J. 458, 484 (N.J. 2005)........ 55
Washington V. Recuenco (harmless error analysis) U.S. 126 S.Ct. 2546 (2006)........ 54

**Other Authorities**

8 Wigmore, Evidence § 2268 at 402-03 (McNaughton rev. 1961........ 43

**QUESTIONS PRESENTED**

**I. WHETHER A NEW TRIAL IS MANDATED WHEN A DEFENDANT'S CONSTITUTIONAL RIGHT TO CONFRONTATION IS VIOLATED WHEN THE TRIAL JUSTICE ERRONEOUSLY PERMITS THE PRIOR RECORDED TESTIMONY OF AN UNAVAILABLE WITNESS TO BE READ TO THE JURY AND FAILED TO HAVE THE TESTIMONY STRICKEN WHEN THE WITNESS WAS SUBSEQUENTLY MADE AVAILABLE TO TESTIFY?**

**II. WHETHER A DEFENDANT'S CONSTITUTIONAL RIGHT TO CONFRONTATION IS VIOLATED WHEN THE TRIAL JUSTICE ADMITS UNRELIABLE HEARSAY TESTIMONY UNDER RULE 804(c) OF THE RHODE ISLAND RULES OF EVIDENCE, MANDATING A NEW TRIAL?**

**III. WHETHER A NEW TRIAL IS MANDATED WHERE, AS HERE, THE TRIAL JUSTICE ERRED IN REFUSING TO PASS THE CASE AFTER RECEIVING REPORTS OF JURORS' CONCERNS FOR THEIR SAFETY?**

**IV. WHETHER TRIAL COURT BARRING TESTIMONY OF DEFENSE WITNESS VIOLATES SIXTH AMENDMENT RIGHT OF DEFENDANT TO PRESENT A DEFENSE AND THAT SUCH ERROR IS NOT HARMLESS?**

**V. WHETHER SENTENCING ENHANCEMENT IMPOSED BEYOND THE STATUTORY MAXIMUM PURSUANT TO THE CAREER OFFENDER STATUTE VIOLATES THE DEFENDANT'S SIXTH AMENDMENT RIGHTS AND THE HOLDING IN BLAKELY.**

## STATEMENT OF THE CASE

This case arises from allegations of murder in the first degree made by The State of Rhode Island against the defendant, Ricardo Ramirez. This case began on May 5, 1982, when Marc Forte was walking through a cornfield in North Smithfield and discovered skeletal remains (T.I.103). The medical examiner at that time was Dr. Arthur Burns. As Dr. Burns was unavailable for this trial, Dr. Elizabeth Laposata re-examined the pictures and files regarding the crime scene and determined, based on the state of the bones, that the body had probably been there for some time between 8 months and a little over 1 year. Laposata determined that one gunshot wound to the back of the head was the cause of death (T.I.164). It was ruled a homicide because the gunshot was to the back of the head, and no weapon was recovered (T.I.168-169). A license was recovered from a pocket of the pants present, identifying the body as that of William Sargent. By using dental records, Laposata was able to conclusively determine that the remains were in fact those of Sargent (T.I.165, 168).

Captain Martineau, of the North Smithfield police, was in charge of the investigation. Martineau went to the cornfields with patrolman Mowry to investigate the scene further. There, they found a set of keys (T.I.123). Once it was determined that the remains were in fact those of Sargent, Martineau returned to Marquis Towing, who he had earlier learned towed a Buick belonging to the wife of Sargent. At Marquis Towing, there was a truck owned by Sargent at the garage. The keys found near the body started the truck (T.I.126). Martineau turned the focus of the investigation to the associates of Sargent (T.I.122). He interviewed Jean L'Esperance, Alfred Limburg, and George Joyal (T.I.122). During the course of conducting interviews, the investigation discovered the name of Ricardo Ramirez from various individuals (T.I.132). However, Mr. Ramirez was never brought in for questioning, nor were charges ever brought against him (T.I.133)..[1] The murder case went cold

[1] This is in despite of the fact that the police had statements from 3 people who said that it was Ricky who murdered Sargent. (T. I. 134).

until it was reopened eighteen years later on November 6, 2000 when Detective Riccitelli was assigned to the case.

The events that allegedly lead to the murder of Sargent began in the early months of 1981. During that winter and spring, Mr. Ramirez, Glen Bogan and the decedent, William Sargent were allegedly engaged in the criminal act of stealing and chopping cars.[2]

On March 14, 1981, at 3am, Bogan stole a white Ford truck from Pawtucket. The truck did not have a right headlight or a rear taillight. Bogan was pulled over by Officer Atstupenas while he was traveling on Mendon St. in Woonsocket (T.II.185). Atstupenas remembered that there was a car in front of the truck at that time. Atstupenas called into dispatch and gave his location and the license plate of the truck. He approached the operator of the truck, who did not have a license, but did have a Rhode Island Identification Card with a picture. The operator was identified as Glen Bogan (T.I.189). At this time, a car approached from the opposite direction. There were two passengers in the car. The driver of the vehicle told Atstupenas that there was a car accident at the intersection of Milk St and Mendon St (T.I.190). Atstupenas radioed dispatch, but no other patrolmen were available to investigate the accident. The car came back again and inquired if the police officer was going to be responding to the accident. Atstupenas told Bogan to wait at the truck while he went to investigate the accident. At this time, before Atstupenas drove away, he noted the license plate of the car; it was Rhode Island IE-87 (T.I.193). Atstupenas drove to the alleged scene of the accident several minutes after it had been reported to him. There was no evidence of an accident (T.I.193). However, it was dark and Atstupenas never left his car to investigate further (T.I.232). Atstupenas then drove back to where he had left Bogan with the truck. The truck was still there, but Bogan was gone (T.I.194). Atstupenas learned from dispatch that the truck had been stolen

[2] Mr. Scanlon had given a statement to the police in March 2001, and said that Ramirez told him a truck he had was stolen. At trial, Scanlon claimed he did not remember making that statement and he had never signed the transcript authorizing that he had made those statements (T. III. 504).

from Pawtucket (T.I.195). While Atstupenas was waiting with the truck for a tow, the car that had reported the accident, license plate IE-87, drove by again. Atstupenas pulled the car over and asked the passengers for identification. The two passengers were Mr. Ramirez and Sargent, with Mr. Ramirez being the operator and the one who reported the accident (T.I.196). The car that Mr. Ramirez and Sargent were driving was a gray Buick, registered to Rachel Sargent, Sargent's wife (T.I.202).

Sargent, at this time, was renting a garage from Alfred Limburg. Limburg had known Mr. Ramirez for 10 years, and Sargent for 10 years (T.II.243). James Scanlon, a friend of Mr. Ramirez and Sargent, was at Limburg's garage one night with Mr. Ramirez and Sargent. They were working together on a truck that Scanlon had driven Mr. Ramirez to a few days earlier (T.508-509). At the garage, he heard Mr. Ramirez and Sargent talking about taking the truck apart, and he assumed it was stolen (T.III.508)[3].

Sometime before April 1981, most probably in March, Limburg testified that saw Mr. Ramirez and Sargent together at his garage. .[4] By this point, Sargent had been renting the garage for two (2) months. Limburg testified that he saw Sargent dismantling a stolen U – Haul truck, but did not see Mr. Ramirez participating. (T. II. 265,285). At some point after that incident, Limburg visited Sargent at his house (T.II.246). When Limburg arrived, Sargent was on the telephone. Limburg asked Sargent about the telephone call, and before learning who Sargent was talking to, Limburg told Sargent he was closing the garage and that Sargent had to get out. After Limburg told him that, he inquired about the phone conversation, and Sargent said, "I was talking to the police, I

[3] Scanlon testified at trial that Ramirez never told him he stole the truck (T.III.510).
[4] Limburg had earlier testified to the Grand Jury that he had never seen Ricky and Sargent together at the garage (T. II. 279, 282)

am an informant." (T. II. 267). [5]. Sargent declared that he was an informant for the state police, informing Officer Marzini. Approximately a month after this meeting, in May 1981, Limburg closes the garage (T.II.270)

In spring 1981, Henry Cassidy met with his cousin Mr. Ramirez (T.II.338). He met Sargent through Mr. Ramirez. He told Mr. Ramirez that he would often see Sargent on the phone at Mister Donut in Woonsocket and that because of this, he assumed Sargent was an informant (T.II.341). After Cassidy told Mr. Ramirez of his suspicions, Mr. Ramirez just said, "yeah" (T.II.343). Cassidy testified that this was a wild guess on his part and that his cousin Mr. Ramirez showed no concern about the information (T.II.249).[6]

Around the same time period that Limburg closed the garage, Mr. Ramirez went to Limburg's house. Ramirez wanted to know if Limburg was an informant, and said that if Limburg was, then he would shoot him (T.II. 254-255). Mr. Ramirez also inquired if Sargent was an informant and how well did Limburg know Sargent. .[7] Limburg said that he knew Sargent. Limburg did not directly answer whether or not Sargent was an informant. He told Mr. Ramirez that if he "doesn't trust him, don't deal with him" (T. II. 283). Limburg claimed that he did not want to tell Mr. Ramirez that Sargent was an informant because he was not completely certain if Sargent was, and he did not want Mr. Ramirez to kill him (T. II. 295-296).[8]

---

[5] Officer Marzini testified that Sargent was his confidential informant during the spring of 1981 (T.II.318). Marzini never notified the police that Sargent was his informant, and the first time he told anybody was in August 2002 (T.II.334).

[6] Cassidy did not want to give a statement to the police about what he had told his cousin. However, when he asked for a lawyer, Detectives Riccitelli and Killian, who went to the ACI to get his statement, told him that he does not need a lawyer because he does not have any rights.

[7] Limburg first testified that Ricky first asked Limburg about Sargent before Limburg had visited Sargent's house and was told he was an informant. Ricky asked Limburg a total of 2 times, once at his house and once at the bar. (T. II. 268). Limburg later testified that Ricky asked if Sargent was an informant after Limburg had visited Sargent's house (T. II. 282)

[8] In January 2001, Limburg said that Ricky never inquired if Sargent was an informant. (T. II. 290). According to his testimony in this case, he lied to police in 2001 because he was in fear of Ricky (T.

On April 27, 1981, Limburg saw Mr. Ramirez at a bar in Woonsocket (T.II.256). Mr. Ramirez inquired many times that evening whether Sargent was an informant. Limburg never answered yes or no (T.II.257-258). At 3am on April 28, 1981, after that night at the bar, Mr. Ramirez went to Limburg's house (T.II.258)..[9] He was angry at Limburg because Sargent had told Mr. Ramirez that Limburg was an informant (T.II.259). Limburg denied that he was an informant. Mr. Ramirez told Limburg that Sargent was going to shoot him, and tried to convince Limburg to let him stab him [Limburg] with an ice pick and then put gunpowder on the wound so that it would look like Limburg was shot and then Sargent would not shoot him (T.II.258-259). Limburg said no, that will not work.

Mr. Ramirez decided that evening that he wanted to go to Sargent's house to find out if Sargent was an informant (T.II.260). Mr. Ramirez and Limburg drove to Sargent's house in Sargent's truck. At 5:00 a.m., they were in a car accident on the way there. They had crashed into a fire hydrant and some bushes (T.I.204). They left the scene of the accident. Mr. Ramirez grabbed a machete out of the back of the truck, and the two men walked back to Limburg's house to get Limburg's van. When they arrived at the van, Mr. Ramirez threw the machete into the back and the two men started the drive to Sargent's house. Officer Atstupenas was investigating the truck's accident, and while patrolling the area, pulled over the van (T.I.205). The men inside the van were taken into custody for the circumstances surrounding the truck crash (T.I.205).[10] When they were arrested outside of the van, they were searched and no guns were found. .[11] The police contacted Sargent and he went to the station to give a statement that he had loaned his truck to Mr. Ramirez

---

II. 293). Defense objected and was sustained when State asked Limburg generally "you were in fear?" (T. II. 292-294).

[9] Both men were intoxicated at this point ( T. II. 271-272)

[10] Limburg testified that it was only him and Ricky in the van. (T. II. 274). However, Officer Atstupenas testified that Limburg, Ricky and a third party, Hernandez, were all in the van (T. I. 205).

(T.I.206). Through the course of that evening, Limburg never saw Mr. Ramirez with a gun, nor was one discovered when the police searched them. The next morning, April 28, 1981, Sargent picked up Mr. Ramirez and Limburg from court (T.II.261). Limburg never saw Sargent again (T.II.262).

One night[12] in 1981, Mr. Ramirez visited the house of Mr. Bogan and his girlfriend, Debra Arel. At the time, Bogan and Arel were living on Fourth Ave. in Woonsocket (T.II.392). Mr. Ramirez was wearing his painters pants stained with all different colors[13], and Arel testified she remembered he was either wearing a shirt or was taking it off (T.II.393, 397). Mr. Ramirez walked past Arel in the living room, and went to the back of the apartment where Bogan was located (T.II.393). Arel could not hear what was said between the two of them. She never saw Mr. Ramirez leave and does not know what he was wearing when he left (T.II.394). Arel testified that Bogan later told her that Mr. Ramirez came over for a change of clothes (T.II.394).

Glen Bogan's brother, Patrick, was living at First Avenue at the time his brother was living on Fourth Avenue (T.II.379). At one point[14], when the brothers were living on First and Fourth Ave, Patrick took his dogs for a walk near Blackstone River (T.II.380). On that day in question, Pat saw Glen throw an empty bag into the river (T.II.381).[15]

Florian Marquis was telephoned around May 13, 1981[16], about a disabled vehicle, a Buick, on Industrial Highway and that the keys were on the console. When he arrived, the keys were not there, but Marquis was able to tow the vehicle from the cornfields (T.I.136-137). The registration in

---

[11] Throughout that whole evening, when Ricky was talking about the ice pick idea to when the men were talking on the porch to when they were in the truck, Limburg never saw Ricky with a gun. (T. II. 275).

[12] Arel does not remember the date, nor the month, the season, neither the weather nor the time of day of this alleged visit (T. II. 397).

[13] Arel testified that the pants were stained with paint, and she never said that the pants were covered in blood (T. II. 401). However, Arel had testified to the Grand Jury when questioned about the stains on the clothes, "I would have thought maybe it was blood."

[14] Patrick does not independently remember the year this occurred. It was understood to have been 1981 because that is when the brother's were living at those particular residences (T. II. 385-386).

[15] Pat also testified that "everybody would throw stuff there." (T. II. 388).

the Buick was for Rachel Sargent. Three months later, he was able to locate Rachel Sargent and have her pick up her car (T.I.139). At the same time after he towed the Buick, he also towed a truck registered to Sargent. He towed the truck from a street off of North Main St.[17] The truck was still at his garage when the police came in 1982 to question him about the Buick (T.I.142). There, the police officers used the keys they had found near the skeleton, and it started the truck (T.I.143).

By the end of May of 1981, Sargent had stopped paying his rent money was evicted on the 1st of June for non-payment (T.I.117-118).

In September 1981, George Joyal returned to Woonsocket after being discharged from the army, and was living with his sister, Jean L'Esperance. Joyal was acquainted with Mr. Ramirez because he had been married to Mr. Ramirez's sister, Alice, in 1968 (T.III.425). Alice and Joyal divorced, but Joyal remained friendly with the family (T.III.427).

Mr. Ramirez gave Joyal employment painting (T.III.432). Mr. Ramirez paid Joyal with a $200 check for his work (T.III.465). Joyal gave the check to his sister in return for $200 in cash. When L'Esperance went to cash the check, it bounced (T.III.467). Mr. Ramirez explained to Joyal that he did not have any cash at the time, but that he would pay him down the road (T.III.467). Joyal testified that the only payment Mr. Ramirez ever made on that check was for $50 (T.III. 467). Joyal saved that check until the trial in September 2002, over twenty years later, often looking at it in his basement as a reminder not to let Mr. Ramirez do that to him again (T.III.468). .[18] Joyal would often mention this check incident to his son Chris Joyal, who testified that Joyal would talk in a revengeful way, like Joyal had to get even with Mr. Ramirez.

Joyal testified that after the check incident, at some point in 1981, Mr. Ramirez told him that

---

[16] Marquis could not recall the date, it was supplied to him by his police report (T.I.146).
[17] This is the place Ramirez and Limburg got into the accident on the way to Sargent's house.
[18] Joyal testified to the Grand Jury that it was like a curse around his neck

shot somebody and they threw the body in North Smithfield (T.III.517).[23]

On November 6, 2000, the murder case of Sargent was reopened when Detective Riccitelli was assigned to the cold case homicide (T.III.550). Detective Killian joined Riccitelli and the pair would gather as much intelligence information as possible regarding the murder case (T.III.553). By December 18, 2000, they decided to begin the next phase of the investigation and start conducting interviews with persons possibly involved. On December 19, 2000, Detectives Riccitelli and Killian requested that Joyal go to the Rhode Island State Police headquarters to be interviewed. Joyal originally denied having any information regarding Sargent's murder (T.III.563). They notified Joyal that they were aware of a police statement he made in 1982 regarding Mr. Ramirez's request that Joyal help him move a body. The police then asked if Joyal would wear a body wire to assist in the investigation (T.III.565). A few hours after the interview ended, Joyal talked to Mr. Bogan about the murder of Sargent (T.III.455). )[24]. The name Pat Bogan came up during this conversation, so the next day, Joyal wore the wire again and engaged in conversation with Pat Bogan (T.III.455). Joyal continued to wear the wire for the remainder of the week and engaged others in conversations concerning Sargent's murder (T.III.569). The police brought various individuals in for questioning, including Glen Bogan, Limburg, Scanlon and Arel.

On or about February 1, 2000, the detectives interviewed Glen Bogan (T.III.570). Initially, Bogan denied having any knowledge of Ramirez's involvement in Sargent's murder (T. III.571). The police confronted Bogan with the fact they had recorded conversations detailing the information he had about Ramirez's involvement in Sargent's murder, and after that, Bogan provided the police with information (T.III.573).

---

[23] Holske does not remember when the statement was made, or where she was living at the time it was made (T.III.524). She testified that it was made at the beginning of their relationship, prior to the marriage in 1980

[24] In reality, the wire conversations occurred on December 19,2000 and the statement to the police occurred on December 20,2000 (T.III. 461-462).

At some time after the interview of Glen Bogan, the detectives interviewed Limburg (T.III.574). He also denied having any knowledge about Sargent's murder, but became more cooperative when confronted with the fact that the detectives had his police statement from 1982 (T.III.575).

On or about February 23, 2001, Mr. Hathaway of the Rhode Island Crime Lab determined that the largest bullet fragments found at the scene with the skeletal remains had the appearance of a .22 caliber type of base. (T.III. 601).[25]

## ARGUMENT

### I. MR. RAMIREZ'S CONSTITUTIONAL RIGHT TO CONFRONTATION WAS VIOLATED WHEN THE TRIAL JUSTICE ERRONEOUSLY PERMITTED THE PRIOR RECORDED TESTIMONY OF GLEN BOGAN TO BE READ TO THE JURY AND FAILED TO HAVE THE TESTIMONY STRICKEN WHEN MR. BOGAN WAS SUBSEQUENTLY AVAILABLE TO TESTIFY, BOTH OF WHICH WERE REVERSIBLE ERROR

Mr. Ramirez's constitutional right to confront his accuser before a jury of his peers was violated when the trial justice erroneously permitted the former testimony of Glen Bogan, a state's witness, to be read to the jury based solely on the representations of the state and an improper use of judicial notice that reasonable efforts had been made to procure Mr. Bogan's presence at the trial. The prior recorded testimony of Mr. Bogan formed the foundation and support for the state's case against Mr. Ramirez. Because of the significant reliance the state put on Mr. Bogan's former testimony to prove their case, the trial justice's error in admitting the testimony was not harmless, and requires that Mr. Ramirez's conviction be set aside, and he be granted a new trial.

A <u>The trial justice abused his discretion when he determined that Glen Bogan was "unavailable."</u>

A fundamental and essential safeguard for protecting Mr. Rameriz's constitutional right to confrontation was eviscerated when the trial justice made the erroneous determination that Mr.

defendant's strong interest in confronting his accusers and the prosecutor's duty to provide a fair trial for the defendant and to protect the defendant's constitutional rights, the prosecutor's invocation of this exception cannot be granted routinely." State v. Hannagan, 473 A.2d 291, 293 (R.I. 1984). "When the declarant is not present at trial, the confrontation clause normally requires that he or she be shown to be unavailable." Scholl, 661 A.2d at 61.

This Court has stated that a witness's unavailability and the use of that witness's former testimony at trial may violate a criminal defendant's constitutional right to confrontation unless "the proponent of that testimony has made a 'reasonable' and 'good faith' effort to procure that witness's attendance for trial." Sosa, 839 A.2d at 524 (citing Roberts, 448 U.S. at 74, 100 S.Ct. 2531; State v. Brown, 744 A.2d 831, 835 (R.I. 2000)). The determination of whether the state has "exercised reasonable diligence in securing the presence of a witness is assessed on a case-by-case basis." Id. When there has been an affirmative showing that the trial justice abused his or her discretion in making such a determination, this Court will set aside any finding of due diligence and good faith. Id.

1. It was an abuse of discretion for the trial justice to refuse to take any sworn testimony regarding the efforts made by the state to procure Mr. Bogan's attendance at trial.

Critical to the inquiry as to whether unavailability was established is the fact that Mr. Bogan was in the courtroom on the day prior to the finding and was to remain available for an immunity hearing. It logically follows he was available within the jurisdiction and likely available to process being served upon him. Also critically important to the analysis was that Mr. Bogan presented himself back before the court following the reading of his prior recorded testimony and at this point the trial justice and the state decided to reopen or obtain immunity respectively.

Without requiring any witnesses to take the stand to provide sworn testimony as to the efforts that had been made to procure Mr. Bogan's attendance, the trial justice merely relied on the

---

as to the caliber (T.III.601)

representations of the state in determining that Mr. Bogan was "unavailable." Such action was violative of Mr. Ramirez's constitutionally protected rights and cannot be justified by principles of practicality or judicial economy. Never before has this Court upheld a trial justice's finding that a witness was "unavailable" for purposes of admitting prior testimony without first being provided sworn testimony from individuals directly involved in the efforts to procure the witness. See Sosa, 839 A.2d at 525 (noting the state's presentation of a detective who recounted the efforts he made to locate the witness before trial); Brown, 744 A.2d at 835-36 (finding support for trial justice's discretionary finding of "unavailability" in police officer's testimony concerning the officer's personal efforts to locate the witness); Hannagan, 473 A.2d at 293-94 (insisting upon "competent proof of a witness's unavailability" in the form of expert testimony to support a finding of a witness's unavailability due to illness); State v. Lemon, 478 A.2d 175, 178-80 (R.I. 1984) (recognizing the trial justice's consideration of an affidavit corroborating a witness's unavailability); State v. Prout, 115 A.2d 451, 454-56 (R.I. 1975) (examining the testimony of an investigator for the Public Defender's office and a detective of the Providence Police Department personally involved in efforts to locate the witness); State v. Ouimette, 298 A.2d 124, 130 (R.I. 1972) (noting that there must be "sufficient proof of the unavailability of the witness," before "careful[ly]" examining the testimony of a police officer and prosecutor directly involved in the efforts to procure the witness).

Here, when the state announced its intention to introduce Mr. Bogan's prior testimony, the state made oral representations to the trial justice as to the efforts of members of various police agencies to locate Mr. Bogan. Many of these representations of the efforts made to locate Mr. Bogan concerned locating him for purposes of conducting immunity proceedings. The reason for immunity was Mr. Bogan was to recant testimony from a prior trial incriminating Mr. Ramirez. In presenting its basis for introducing Mr. Bogan's prior testimony, the state failed to offer a single witness or affidavit that corroborated its representations as to the efforts to locate Mr. Bogan. More

importantly, the trial justice did not inquire as to the state's representations, nor did the trial justice request any such testimony. In fact, the trial justice affirmatively refused to entertain any such idea, even in light of the serious constitutional guarantees that were at stake. After hearing only from the state and Mr. Ramirez's council, the trial justice stated: "I find as a fact and as a matter of law [that Mr. Bogan] is unavailable. We need not get into testimony, as far as I'm concerned, from law enforcement as to what their efforts have been over the last particularly 24 hours at this point. . . . If the time for him to be called comes and he is not here, then the rule will be implemented and there will be no prejudice to the defendant." (T.II. 374-75)

While this Court has found the sworn testimony of individuals directly involved in the efforts to locate an "unavailable" witness, sufficient to support a trial justice's finding of "unavailability," here the record is devoid of any such testimony. In light of this Court's holdings concerning a trial justice's finding of "unavailability," it was an abuse of the trial justice's discretion not to request or demand that the state provide sworn testimony from those directly involved in the efforts to locate Mr. Bogan.

Moreover, here, the defendant provided evidence to the state and the court that Mr. Bogan's testimony at the trial would be contrary to the prior proceeding, which the state intended to introduce once Mr. Bogan was found to be "unavailable." The defendant produced documentation which indicated that Mr. Bogan's testimony, if protected by immunity, would recant much of his prior testimony that was adverse to Mr. Ramirez. Mr. Ramirez's well-established constitutional right to confrontation, the seriousness of the charges against him, and the significance and essential character of Mr. Bogan's prior testimony to the state's case, all required that the trial justice take additional steps before finding Mr. Bogan to be "unavailable." These steps, however, do not include the trial justice's stated personal knowledge and judicial notice of the efforts made to procure Mr. Bogan's presence, which were used in justification of finding Mr. Bogan "unavailable."

2. <u>The trial justice erroneously relied on an impermissible use of judicial notice to find that the state had made the necessary efforts to procure Mr. Bogan's attendance.</u>

After making the determination that he would not "get into testimony. . . from law enforcement as to what their efforts have been" to locate Mr. Bogan, the trial justice offered additional, but insufficient support to buttress his finding that Mr. Bogan was "unavailable." "The Court knows and takes judicial notice that the efforts have been ongoing." (T.II. 375) With respect to proof of the state's efforts to locate Mr. Bogan, the trial justice commented:

> I'm not going to become a material witness in this case, but as the Presiding Judge in this trial, I have received various reports from law enforcement agencies not the police officers assigned to the case but the Sheriffs Department who went out to look for him yesterday from the writ department, and they told me they scoured the downtown area looking at areas that may be used by Mr. Bogan during the course of the day. We know that due diligence has been engaged in by legitimate law enforcement officers to try to locate this person pursuant to a court order. (T.II. 372)

Again, the trial justice's use of personal knowledge and judicial notice as his evidentiary basis for finding diligence on the part of the state is unprecedented. Even when combined with the uncorroborated representations of the state, the trial justice's basis is insufficient to support his finding that the state had made the necessary efforts to locate Mr. Bogan. This Court has never condoned a trial justice's discretionary finding that a witness was "unavailable," for purposes of introducing prior testimony, based on the trial justice's own, uncorroborated personal knowledge, or the taking of judicial notice. When a criminal defendant's constitutional rights are in play, certainly justice and fairness require more.

The effect of judicial notice is to relieve the favored party of the burden of adducing evidence supporting the inference contended. <u>See</u> <u>Johnson v. Palange</u>, 406 A.2d 360 (1979) (judicial notice that abusive epithets provoke a violent reaction). However, when the state is required to provide "sufficient proof of the unavailability of the witness," it is an abuse of discretion for the trial justice to relieve the state of such a burden by means of judicial notice. While Rule 201 of the Rhode Island Rules of Evidence does permit a trial justice in a criminal case to take judicial notice of certain facts,

noticing ongoing efforts to locate a witness supported by the trial justice's personal knowledge are not within the scope of the rule. R.I. R. Evid. 201(a). The Rules of Evidence clearly define the kinds of facts that may be noticed: "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." R.I. R. Evid. 201(b).

Here, the facts found by the trial justice, that Mr. Bogan was unavailable and that "efforts have been ongoing" to locate him, do not come within either of the two permissible types of facts which may be judicially noticed. It cannot be argued that the fact that Mr. Bogan was "unavailable" was "generally known within the territorial jurisdiction of the trial court." Furthermore, such a fact was not "capable of accurate and ready determination by resort to sources whose accuracy [could not] reasonably be questioned." This is because the record did not provide any sources other than the representations of the state and the trial justice's own personal knowledge. Neither the counsel for the state, nor the trial justice were directly involved in any of the efforts that were undertaken to locate Mr. Bogan. While the state and the trial justice did state that they had received various reports of the efforts made to locate Mr. Bogan, such statements were hearsay, as none of the individuals directly involved testified to any such efforts.

This Court has held that the doctrine of judicial notice, incorporated in Rule 201, could not be expanded to overcome the rules of hearsay, and the possibility that a court has taken improper judicial notice can result in prejudicial error. In re Michael and Joseph A., 552 A.2d 368, 370-71 (R.I. 1989). In In re Michael and Joseph A., this Court remanded a parental rights termination case because of the possibility that the justice of the family court had taken improper notice. Id. When the trial justice, in that case, orally announced his decision to terminate parental rights, he referred extensively to reports that indicated the parents were unable to care for the children; however, the

reports had not been admitted into evidence in the proceeding, but had been filed during an earlier dependency hearing. Id. at 368-69. On appeal, this Court recognized that, even though there was "an abundance of evidence . . . that tended to show that [the parents were unfit to care for the children]," the Court could not tell from the record whether or not the trial justice had relied on these reports in reaching his decision. Id. at 370-71. Because of this, the case was remanded with the instructions that the trial justice either (1) expand the record by allowing "competent testimony from the authors of these reports with attendant right of cross-examination and rebuttal by the parents," or if such is not possible, "the trial justice may formulate a new decision based solely upon the evidence that was properly presented in the course of the prior hearings." Id. at 371. In addressing Rule 201, this Court stated that:

> [although Rule 201] does not deal specifically with the matter of judicial notice of a court record, it would by clear implication only apply to those aspects of a court record which cannot be reasonably disputed. These would include judgments previously entered by the court that have effect of res adjudicate, pleadings or answers to interrogatories by a party, which pleadings or answers might constitute an admission. . . . Although the foregoing examples do not purport to be exhaustive, they would obviously not include expert reports that may have been incorporated into a pleading and never admitted into evidence and whose authors were not subject to cross-examination.

Id. at 370 (internal citations omitted).

Here, like the reports in In re Michael, the hearsay representations of the state, and reports received by the trial justice were not admitted into evidence, nor were they subject to cross-examination. Because the record clearly indicates that these hearsay statements were relied on by the trial justice when he took judicial notice, and found that Mr. Bogan was "unavailable," such action was impermissible and prejudicial error.

3. The state's efforts to locate Mr. Bogan fell well short of what this Court requires, and the trial justice erred in finding that the state had met its burden.

Even if the trial justice did not abuse his discretion in relying solely on the uncorroborated representations of the state and those cited by the trial justice to find that Mr. Bogan was

"unavailable," the efforts put forth by the state and the trial justice were insufficient to support the trial justice's discretionary finding. As this Court has said, "[a] witness's unavailability and the use of his former testimony at trial does not violate the defendant's right to confrontation if the proponent of that testimony has made a 'reasonable' and 'good faith' effort to procure that witness's attendance for trial." Sosa, 839 A.2d at 524. Whether or not the state has exercised the requisite diligence is assessed on a case-by-case basis. Id. While this Court has not defined the exact steps that are required, prior holdings of this Court indicate that the purported efforts made by the state in this case do not meet the minimal efforts required to maintain the defendant's constitutional rights. First it is necessary to distinguish the efforts that were made, as put forth by the state, to locate Mr. Bogan when he failed to appear for his immunity proceeding, noting he was in the courtroom later that day (CITE). It is not clear whether these efforts were also being exercised to procure his attendance at the actual trial. Presumably, the immunity proceeding would have to take place before the state proceeded to call Mr. Bogan as a witness. The specific question here is whether or not the state made a good faith effort to procure Mr. Bogan's attendance at the trial, not at the immunity proceeding. It may be inferred however, that the state intended to call Mr. Bogan immediately following a determination of the question of immunity.

After being appointed counsel, the trial justice found that Mr. Bogan had a Fifth Amendment right, which he indicated he would exercise when called as a state's witness; therefore, the state began immunity proceedings before Justice Rodgers. The state indicated that it was aware that Mr. Bogan might be contemplating "fleeing." (T.II. 368) When Mr. Bogan did not appear before Justice Rodgers at the designated time, the trial justice issued a body attachment. According to the state, the attachment was given to the detectives to compel Mr. Bogan to appear before the trial court. The state then offered uncorroborated hearsay representations to the trial justice concerning the efforts that had been made to locate Mr. Bogan.

First, if the state had any indication that Mr. Bogan might be thinking about not returning for his immunity hearing and subsequent testimony at trial, it had the affirmative duty to make sure he did not leave, especially given the adverse nature of the witness's testimony to the state's case. As this Court has stated, "the duty to undertake reasonable efforts to procure a witness's attendance at trial includes the concomitant duty to make reasonable efforts to prevent that unavailability in the first place." Sosa, 839 A.2d at 525-26 (citing United States v. Mann, 590 F.2d 361, 368 (1st Cir. 1978). In Mann, the key prosecution witness had an indictment against her dismissed and was then deposed by the government. At the deposition, the witness was asked whether she would return to testify at the defendant's trial; the witness indicated that she would not, and that she intended to leave the country immediately. Notwithstanding this information, the government returned the witness's passport and airline tickets. When asked to return for the trial to testify, she refused. The trial court declared the witness unavailable and ruled that the witness's deposition could be read into evidence. The First Circuit reversed, holding that the government had failed to show that it had made a good faith effort to procure the witness's presence at trial. 590 F.2d at 367. The court stated, "[i]mplicit . . . in the duty to use reasonable means to procure the presence of an absent witness is the duty to use reasonable means to prevent a present witness from becoming absent. Id. at 368 (emphasis added).

When the defendant in Sosa made a similar argument, this Court found that the state did not fail to prevent the witness's presence at trial. 839 A.2d at 526. This Court distinguished that case from Mann, by stating, "[u]nlike Mann, there was no indication that [the witness] would be unavailable for trial." Id. This Court further noted that [i]mportantly, [the witness] appeared and testified at the first trial, giving the state no reason to believe he wouldn't do so again, if necessary." Id. (citing State v. Brown, 744 A.2d 831, 837 (R.I. 2000) "[The witness] had been a cooperative witness for the state, and therefore we do not fault the state for not taking steps to prevent his

disappearance before trial.").

Here, the case is more like Mann than Sosa. Mr. Bogan could hardly be colored as a cooperative witness for the state; the state had difficulty locating Mr. Bogan at the first trial. Furthermore, like the government in Mann, here there was an indication that Mr. Bogan might not return for his immunity proceeding or his testimony at trial. This was acknowledged by the state to the trial justice when discussing Mr. Bogan's failure to appear for his immunity proceeding. With Mr. Bogan's prior history, and his own indication that he might not return, the state had an affirmative duty to prevent him from disappearing. Informing him that he was still under subpoena was not satisfactory discharge of such a duty. There were other measures the state was obligated to exercise as part of its affirmative duty to prevent Mr. Bogan's disappearance. For example restricting him from leaving the courtroom or detaining him.

Even when the state failed to make a good faith effort to prevent his disappearance, it failed to establish that it had made the required efforts to locate Mr. Bogan when he did not appear for the immunity proceeding and the state wished to call him as a witness. The state contended that for less than two hours after Mr. Bogan did not appear for the immunity proceeding, Detective Killian of the State Police and Inspector Sharon Pagliarini of the North Smithfield Police Department checked "various locations" in Providence. These locations were to have include locations of the employment of his family, and family members' houses where Mr. Bogan was once located. These efforts, according to the state, were not fruitful. However, at no time did either of the officers testify nor were any affidavits provided. Furthermore, the state failed to specify the exact locations where the officers had looked. The state offered representations of another round of searches conducted by the same two officers as well as Inspector Riccitelli. Their efforts, which the state claimed exceeded five hours, included attempts to locate Mr. Bogan in "Woonsocket and Providence at residences he had previously been found." (T.II. 364) Again, the state offered no sworn testimony to corroborate

such efforts, nor did the trial justice request any such essential evidence. Absent as well was any showing that a reasonable delay to continue to determine his whereabouts would have been prejudicial.

Counsel for Mr. Ramirez objected, arguing that the state failed to prove that Mr. Bogan was totally unavailable, that the state had only looked for him for one night, and requested that the state make additional efforts before permitting Mr. Bogan's prior testimony to be read to the jury. It was suggested by Mr. Ramirez's counsel that the weekend could be used to locate Mr. Bogan, and the state had numerous witnesses it could call in the meantime. After Mr. Ramiez's counsel objected and suggested additional efforts that could be made, the state added some depth to its representations such that Detective Killian had gone to Mr. Bogan's aunt's house and spoke with her concerning Mr. Bogan's whereabouts. Moreover, the good faith of the state must be questioned due to the undeniable advantage Mr. Bogan's prior testimony would provide for their case, in light of the defendant's indication that Mr. Bogan would in fact recant his prior testimony. Not only would Mr. Bogan's disappearance, and the state's inability to locate him provide the opportunity to introduce his prior testimony, but also, if Mr. Bogan "disappeared" he would not be able to get his immunity which would completely insulate the state from any live testimony from Mr. Bogan which plainly would have defeated the state's case.

4. Even if the trial justice did not abuse his discretion in permitting Mr. Bogan's former testimony to be read to the jury, he abused his discretion when he denied Mr. Ramirez's motion to strike the testimony when Mr. Bogan was available to testify soon thereafter.

After finding that the uncorroborated efforts made by police officers and sheriffs were sufficient to constitute due diligence and good faith efforts in locating Mr. Bogan, the trial justice, over Mr. Ramirez's objection, permitted Mr. Bogan's prior testimony to be read to the jury. When the trial commenced the following week, counsel for Mr. Ramirez explained to the trial justice that Mr. Bogan had appeared in his office that morning and offered an explanation of his failure to appear

at the immunity proceeding, and indicated that he had actually slept in his own bed the night of the search. (T.III. 411-12) Counsel for Mr. Ramirez further contended that contrary to the representations made by the state, no one ever went to Mr. Bogan's aunt's house looking for Mr. Bogan, only that she had been telephoned. After offering Mr. Bogan's explanation for his absence and his whereabouts, counsel for Mr. Ramirez suggested that had more efforts been taken, the state could have located him, and he could have been called at the present time. Furthermore, it was suggested that the state did not employ the necessary efforts to locate Mr. Bogan because it did not want him to testify in the present trial. Rather, the state preferred and was dependant on the prior testimony of Mr. Bogan to prove its case against the defendant.

Mr. Ramirez moved to have the prior testimony stricken from the record, and have Mr. Bogan, who was then present in the courthouse, testify. If the motion was denied, Mr. Ramirez requested that the state continue on with the immunity proceedings, so that the defendant himself may call Mr. Bogan to testify. Both requests were denied by the trial justice, and both decisions were erroneous. First, to strike the prior testimony of Mr. Bogan would not result in prejudice to the state. Mr. Bogan was present in the courthouse and indicated he was prepared to testify if granted immunity. In refusing to strike the testimony, the trial justice again relied on the representations made by the state and his personal knowledge of what the sheriffs had reported to him concerning their efforts to locate Mr. Bogan. In making this finding, the trial justice emphasized the conduct of Mr. Bogan that made him "unavailable." However, such reasoning is misplaced, for this Court has said that the focus must be on the efforts of the party alleging unavailability, not on the ability of the witness to attend. See Lemon, 478 A.2d at 180 (noting the trial justice's error in "focusing his attention upon the ability of the witness to attend as opposed to the ability of the [offering party] to secure [the witness's] attendance"). The trial justice again stated his interpretation of the Rules of Evidence and the applicable case law:

> With regard to the motion to strike, the Court is going to deny the motion. The rules are clear that when a person is absent from the jurisdiction through no fault of the State and after the State has made a due diligent effort to provide the witness, this Court can take judicial notice of the witness's own personal distaste in wanting to testify anyway, and the State in the ordinary course has the opportunity to read into the record competently given testimony from a previous occurrence and that is exactly what happened here. (T.III. 419)

Second, when the trial justice refused to require the state to continue the immunity proceedings, he indicated that Mr. Ramirez may "immunize him through the appropriate procedure;" however, only the state may have a witness immunized under Rhode Island law. R.I. Gen. Laws 12-17-15 (2006). Nonetheless, the trial justice continued in his ruling, "[w]ith regard to immunization, that process is equally available to the defense as well as the prosecution. . . . So the Court is not going to assist [sic] that anything be done with regard to Mr. Bogan's potential immunization or potential appearance here, and we will note your exception to both rulings." While the law does not permit the defendant to seek immunity, the trial justice indicated that such was possible. Had the trial justice not erroneously interpreted the law, clearly the interest of justice demanded that the defendant's motions would have been evaluated differently.

B <u>Permitting Mr. Bogan's former testimony to be read to the jury and refusing to have the testimony stricken when Bogan was present at trial was not harmless error.</u>

The prior testimony of Mr. Bogan was so crucial to the state's case against Mr. Ramirez, that the trial justice's abuse of discretion in admitting the testimony was not harmless error. Even the state acknowledged the significance of the prior testimony when it indicated to the trial justice that the testimony of its additional witnesses would seem irrelevant until Mr. Bogan's testimony was heard.

When a criminal defendant's Sixth Amendment right to confrontation is violated, the state must show that there is no reasonable possibility that the wrongly-admitted evidence may have contributed to the defendant's conviction. <u>Chapman v. California</u>, 386 U.S. 18, 24; 87 S.Ct. 824; 17 L.Ed.2d 705 (1968). "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. <u>Id.</u> There can be little question that

the wrongly-admitted prior testimony of Mr. Bogan contributed to Mr. Ramirez's conviction.

The prior testimony provided the basis for state's theory against Mr. Ramirez. It was Mr. Bogan's prior testimony, as opposed to what he indicated he would testify to in the present trial, which supplied the majority of the circumstantial evidence that connected Mr. Ramirez to the murder. The prior testimony included statements made by Mr. Ramirez concerning intentions to murder the victim in this case, and statements made concerning Mr. Ramirez's actions on the night the state alleged Mr. Ramirez committed the murder. As was indicated by Mr. Bogan, however, it was his intention to recant all such testimony if permitted to testify in person, in the present trial. Due to the erroneous findings and abuse of discretion on the part of the trial justice, Mr. Ramirez was never provided his constitutionally protected right to confront this witness in an environment where such testimony could be developed.

The weight given to Mr. Bogan's prior testimony by the jury can be inferred from the record. After the jury began its deliberations, the trial justice was presented with a written request from the jury. The question was, "[c]an we please have the testimony of Glen Bogan, i.e., (1) the discussion on the way to Connecticut and on the way home from Connecticut (in the car), (2) discussion between Ramirez and Bogan on the night Ramirez wanted to a change of clothes (in Glen Bogan's kitchen)." (T.IV. 766) The requested portions of Mr. Bogan's prior testimony were then read, by the trial justice, to the jury. Among the testimony of the ride to and from Connecticut, Mr. Bogan's prior testimony included his statement that Mr. Ramirez told him that he (Mr. Ramirez) was "going to take him out," referring to the victim, Mr. Sargent. Additional testimony from the prior proceeding that was re-read to the jury contained Mr. Bogan's assertion that Mr. Ramirez appeared at his home and told Mr. Bogan that he had "taken out Billy Sargent." It was Mr. Bogan's prior testimony that Mr. Ramirez then changed his clothes and asked Mr. Bogan for a plastic bag which Mr. Ramirez then told Mr. Bogan to throw in the river.

told him that he (Mr. Sargent) was working for the State Police. Additionally, the state's witness that was going to compound the good faith nature of Mr. Sargent's statement saying that he was working for the Woonsocket Police. This fact alone calls into question the statement as a good faith declaration. More importantly, the hearsay statement of Mr. Sargent, which the state introduced through Mr. Limburg, was completely self-serving.

The trial justice found that, based on what he had heard, Mr. Sargent had no reason to lie to Mr. Limburg. The trial justice also acknowledged that the statement had been kept out of the first trial, but nonetheless felt that the statement "appears to fit the rule." (T.II. 250) The trial justice ignored the possible prejudice of allowing the statement in when he declared, "I think it falls within the rule particularly if that is all we are going to say here." (T.II. 251) The fact that this statement, that Mr. Sargent was in informant, was the only statement the state sought to introduce through Mr. Limburg, does not lessen the constitutional implications of permitting a hearsay statement under Rule 804(c).

The trial justice seemed to misstate his own ruling when he said, "[the statement] seems to me to fit the rule because it's a declaration made apparently in good faith for no apparent reason to deceive or otherwise be untruthful. It's up to the jury to determine whether the guy was being truthful." (T.II. 252) The problem with that ruling is that Rule 804(c) requires that the trial justice find that the statement was made in good faith before it comes in. The finding of good faith is not to be left to the jury.

When this Court has affirmed a trial justice's admission of a decedent's prior statement under Rule 804(c), it has done so "largely because the court held a voir dire hearing before the State v. Burke, 574 A.2d 1217, 1223 (R.I. 1990)). In Lassiter, the trial justice admitted the prior hearsay statements of a murder victim made to his girlfriend before he died, under Rule 804(c). 836 A.2d at 1103. As this Court correctly pointed out, "because Rule 804(c) is not a 'firmly-rooted hearsay

exception,' out-of-court statements may be admitted into evidence only if they possess adequate 'indicia of reliability.'" Id. (citing Ohio v. Roberts, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 579 (1980); State v. Lynch, 7700 A.2d 840, 847 (R.I. 2001); Burke, 574 A.2d at 1223). Because the trial justice failed to specifically find that Mr. Sargent's statement possessed sufficient indicia of reliability, admitting the statement was reversible error.

In Lassiter, this Court recognized the error of the trial justice's failure to make the prerequisite finding of reliability, yet declined to pass upon the defendant's assignment of error because the argument was not properly preserved for review. 836 A.2d at 1103-04. Here, Mr. Ramirez's argument was clearly preserved in the record. (T.II. 247-52) Mr. Limburg went to Mr. Sargent's home to tell him he was going to have to close the garage Mr. Sargent was working out of because he suspected Mr. Sargent was conducting illegal activity inside the garage. Certainly, it could have served Mr. Sargent well if he were able to have Mr. Limburg believe that he was an informant and therefore, would not have to leave the shop. Such a possibility calls into question a finding of good faith in Mr. Sargent's statement.

This Court has held that Rule 804(c), unlike other jurisdictions, applies in criminal cases as well as civil cases. Burke, 574 A.2d at 1221-22 (noting that the Supreme Judicial Court of Massachusetts, in Commonwealth v. Gallo, 175 N.E. 718 (Mass. 1931), held that its statute, which at the time was identical to Rule 804(c), did not permit otherwise hearsay statements to be entered into evidence in a criminal prosecution). "Although the exception applies to all cases, hearsay evidence will only be permitted if certain constitutional safeguards are met." State v. Scholl, 661 A.2d 55, 60 (R.I. 1995). However, when the application of Rule 804(c) in criminal cases has been affirmed by this Court the situations were markedly different than that before the Court in this case. See Lynch, 770 A.2d at 847-48 (affirming trial justice's admission of decedent's statement as an excited utterance, rather than a declaration of a decedent made in good faith which the trial justice's

admission was based); Scholl, 661 A.2d at 61(validating the trial justice's finding of good faith in the decedent's statements where the statements of a seventy-three year old attack victim included a photo identification made to a police officer at the hospital, shortly after the attack); Burke, 574 A.2d at 1223 (affirming trial justice's finding of good-faith and admission under 804(c) of a statement made by an individual who purportedly had just been robbed and beaten with a baseball bat, made to a family member on the premises where the attack took place, shortly after the robbery occurred).

The United States Supreme Court has declined to accept corroboration of an out-of-court statement with evidence other than the circumstances surrounding the making of the statement. See Idaho v. Wright, 497 U.S. 805, 817 (1990) (refusing to consider corroborating evidence for a statement introduced under a hearsay exception). This Court has considered the circumstances surrounding the making of the statement to be significant in determining "good faith." See Burke, 574 A.2d at 1223; Scholl, 661 A.2d at 61.

The "reliability" of a statement cannot be bootstrapped by satisfaction of the Rule's own requirements of "good faith before the commencement of the action and upon the personal knowledge of the declarant" in light of the United State Supreme Court's decision in Crawford. 541 U.S. 36; 124 S. Ct. 1354 (2004). The central holding of Crawford is that the Confrontation Clause is a rule of procedure, not a rule of Evidence. Id. at 1370. The Clause commands that the reliability of a statement must be assessed through the particular mode of cross examination, not merely that the evidence be reliable. Therefore, "where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." Id. at 1374. Just as the Supreme Court in Crawford said the indicium of reliability of an out of court statement that was against penal interest was irrelevant with respect to whether the statement's admission violated the Confrontation Clause, this court should use the same analysis in

finding that the presence of good faith and personal knowledge are irrelevant for determining whether or not the statement by Mr. Sargent to Mr. Limburg violates the Confrontation Clause. While the presence of both good faith and personal knowledge is determinative of whether or not the statement by Mr. Sargent will fall into the clear hearsay exception of Rule 804, under Crawford such things do not, and should not, have any bearing on the question of whether the statement meets the guarantees under the Confrontation Clause . Leaving the regulation of out-of-court statements to the law of evidence would render the Confrontation Clause powerless to prevent even the most flagrant inquisitorial practices. As the Court emphasized "Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty. This is not what the Sixth Amendment prescribes." 124 S. Ct. at 1371. Even were the Court to hold the statement to Mr. Limburg by Mr. Sargent falls into the broad hearsay exception of Rule 804(c), the constitutional considerations that require testimonial statements to be subject to cross-examination should not evaporate. Manifestly here notwithstanding any ruling under a hearsay exception of Rule 804, under Crawford, the admission of the statement of Mr. Sargent is in clear violation of the rights afforded the defendant under the Confrontation Clause.

The admission of the statement of Sargent is not saved by the holding in State v. Feliciano, 206 RI Lexis 140 (Suttell, J.). As Feliciano requires, the statement in question no be testimonial. In Feliciano the statement was a casual remark made to an acquaintance—not a solemn declaration made for the purpose of proving some fact. Id. To the contrary here, the statement is often in direct proof to the point that Sargent was an informant. (T.II. 249). And further that the state characterized Mr. Sargent's statement as "that is not something people say lightly" (T.II. 249) clearly giving the input that this was a solemn statement of the type distinguished in Feliciano.

**III. THE TRIAL JUSTICE ERRED WHEN HE REFUSED TO PASS THE CASE AFTER RECEIVING REPORTS OF JURORS' CONCERNS FOR THEIR SAFETY**

Before the jury began its deliberations, one of the jurors questioned a sheriff about her safety when the verdict would be read. This comment indicated a preconceived notion of guilt or a guilty verdict for Mr. Ramirez before deliberations began. Because of this, Mr. Ramirez's constitutional right to an impartial jury was violated when the trial justice refused to pass the case. Furthermore, comments of sheriffs, overheard by a juror, concerning the necessary security in the courtroom when the verdict would be read, was extremely prejudicial to Mr. Ramirez.

The comment made to the sheriff by one of the jurors, prior to deliberations, was "I hope we are going to be okay when we deliver this verdict." (T.IV. 762) This was reported to the trial justice who returned a message to the juror that assured the juror, "don't be concerned about any reaction from anybody in the courtroom, just put that out of your mind. You're not going to have any problems at all." (T.IV. 763) In addressing Mr. Ramirez's concerns of this statement, the trial justice stated that any assumption that such a statement meant a guilty verdict was "pure speculation." The trial justice even stated that the juror could have been showing such concern for a not guilty verdict.

The trial justice directly addressed the jury following the reports of the comments of the jurors. He stated:

> There seems to be some nervousness about what happens when you return your verdict with crowd control and things of that nature. Please, be advised, that regardless of your verdict, that we have the facilities and the resources to make sure that you are not going to be interfered with in any way by anybody with any interest in this case. . . . We don't want you diverted from your function which is simply to arrive at a verdict. . .(T.IV. 758-59)

As this Court has recognized, "a defendant has a right under the United States and Rhode Island Constitution to a fair trial by an impartial jury." State v. Young, 743 A.2d 1032, 1035 (R.I. 2000) (citing State v. Carmody, 471 A.2d 1363, 1366 (R.I. 1984). In Carmody, this Court reversed the defendant's conviction where a prospective juror held the opinion that the defendant was guilty was found to prejudice the defendant. 471 A.2d at 1366. Even though a cautionary instruction was

given after the remark was made, this Court commented on the instruction, "[a]lthough it stressed the presumption of innocence, it did not clearly direct the jurors to disregard the juror's comments." Id. at 1367. Because the instructions were not sufficient to absolve the prejudice, this Court held that the trial justice abused her discretion in refusing to pass the case. Id.

Here, the record is not clear whether or not the juror's comment to the sheriff about safety when their verdict would be read was also expressed to other jurors. This is because the trial justice failed to conduct any form of voir dire on the jurors. Without doing so, the trial justice had no way of knowing if similar comments were made to other members of the jury before the deliberations began. Furthermore, because the trial justice could not have known if other jurors were exposed to similar comments, he was unable to give ant type of cautionary instruction which would inform the jury to ignore any such comments made by any of the jurors. The only supplemental cautionary instruction had to do with their general safety when their verdict would be read.

## IV. SIXTH AMENDMENT VIOLATED WHERE TRIAL COURT DENIED DEFENSE REQUEST TO CALL DEFENSE WITNESS

Denial of the opportunity to present the defense witness Glen Bogan was a violation of the defendant's right under the Sixth Amendment of the United States Constitution to present a defense. State v. Pari 430 A 2d. 429 (R.I. 1981) In the trial below the defense sought to present the witness Glen Bogan to testify for the defense. (T.IV. 639) Testimony of Bogan was a critical issue through out the trial. [26] At the time of the defense request, the trial court reviewed the travel of this witness's

---

[26] T.I. 58-62, September 17, 2002, (original assertion of the Fifth Amendment by Bogan), T. 99 September 17, 2002 (objection to reference to Bogan testimony by prosecutor in opening argument) , T.I. 149-158 September 18, 2002 (colloquy and finding by court that Bogan's assertion of Fifth amendment proper; state determines to seek immunity), T.I. 217 (Special Assistant A.G. White reports to trial court that on September 18, 2002, the same day, Bogan failed to appear at time specified by Judge Rodgers for the immunity proceeding after instruction for him to do so by Judge Rodgers, prosecutor White, and Mr. Corley court appointed counsel to Bogan. Mr. White advised court Bogan made some reference to a disappearing act. Mr. White requested a body attachment and status as for Glen Bogan as a material witness and that he be held with out bail. The court issues body attachment but declines hold with out bail, T.II. 362-376, on September 19, 20002 (State seeks

potential testimony in this trial. Earlier in the trial the defense presented evidence in the form of a letter from this witness that he was planning to testify that he was recanting testimony he gave in the defendant's prior, trial which ended in a mistrial. (T.II. 366.) In the prior trial Bogan gave testimony implicating Mr. Ramirez in the Sargent murder. That evidence was in the form of statements attributed to Mr. Ramirez that he had killed Sargent.

It became necessary as the State was presenting its case to take up the issue of the witness Mr. Glen Bogan asserting his Fifth Amendment privilege. The state had planned to present his testimony presumptively to be consistent with his prior testimony in the first trial. The trial court took up testimony from Bogan where in he asserted the privilege as to any testimony he might render on behalf of the state at this trial. (T.I. 149-158) It appears that Mr. Bogan was concerned that he would be potentially incriminating himself if he testified in this trial. (Id. At 155) As Mr. Bogan's court appointed counsel, Mr. Richard Corley pointed out to the trial court, if Mr. Bogan were to testify consistent with his prior testimony then there would be no Fifth Amendment issue, it would only be in the instance of changing his prior testimony where potential Fifth Amendment issues would come up. At that stage of the proceedings the trial court ruled that there was sufficient concern that Mr. Bogan was properly raising the privilege. (Id. At 156.) At that point the court left the subpoena for Mr. Bogan in effect and left it to Mr. Corley and the State to work out his presence for the immunity hearing. Id. At 157. The State stated it would be seeking to immunize Mr. Bogan to present his testimony in the trial. Id. at 157. The defendant, following the use of Mr. Bogan's

---

to read Glen Bogan's prior recorded testimony to the jury claiming he is now "unavailable". Trial Court allows prior recorded testimony over defense objection), T.II. 377 (prior recorded testimony read to the jury), T.IV. 639 (defense requests to present witness Glen Bogan as a defense witness, Bogan at the time is present in the court house, defense seeks an order that the state seek immunity for the witness, that did not occur. Defendant seeks to call the witness notwithstanding his insistence on pleading the fifth amendment to ask question which clarify time frames when matters occurred, T.IV. 641, that would not require the assertion of the privilege by the witness. Court denies allowing the witness to answer some questions and assert the fifth amendment as to other questions. Court declines to allow witness to testify unless he waives privilege T.IV. 645-646.

prior recorded testimony requested that the state go forward with its effort to immunize the defendant, the court declined that request, suggesting instead that the defendant pursue immunization (T.III. 419). The defendant appeared before the presiding justice and was advised that seeking immunization was not available to the defendant. (T.IV. 639-640).

The court also in this context further weighed in on the prospects of this defense witness indicating to the state that the court was still waiting for a contempt citation to be drawn against the witness for his failure to return for the immunization process when the state sought his testimony. Id. at 645.

This court has held that denying the defendant the opportunity to present a witness who would have challenged the credibility of a key witness was a violation of their Sixth Amendment right to present a defense. State v. Pari 430 A. 2d 429, 431-433 (R.I. 1981) In Pari this court cited Washington v. Texas 388 U. S. 14, 87 S.Ct. 1920, 18 L. Ed. 2d 1019 (1967) wherein Chief Justice Warren enunciated the principle in declaring the right applicable to the states:

"The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law." Id. at 19, 87 S. Ct. at 1923, 18 L. Ed. 2d at 1023. Id.

The Court in Pari held that such denial of the defense witness cannot be said to harmless beyond a reasonable doubt, citing Chapman v. California, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967); Fahy v. Connecticut, 375 U.S. 85, 84 S. Ct. 229, 11 L. Ed. 2d 171 (1963). State v. Pari, 430 A.2d 429, 431-433 (R.I. 1981)

In Pari the Court observed that after determining that Trooper Pontarelli intended to assert his privilege against self-incrimination to every question asked, the trial justice excused him as a witness, rejected the offer of proof submitted by counsel for the defendants, including the memorandum of the interrogation submitted by Pontarelli to Colonel Stone and refused to allow defense counsel to present Pontarelli as a witness before the jury. This Court held the trial justice in Pari committed prejudicial error. It is clear that here as in Pari the court has committed the same error by denying the defendant the testimony of Glen Bogan which may well have beneficial clarified time frames and supported arguments that the defense sought to make.

In Pari the Court noted, Professor Wigmore states as a general rule that an ordinary witness, as opposed to a defendant, may be required to take the stand and to submit to inquiry concerning relevant facts that are otherwise admissible in evidence, and that if he chooses to assert a privilege against self-incrimination, it is incumbent upon the witness to assert the privilege in respect to those questions that are deemed to be incriminating. 8 Wigmore, Evidence § 2268 at 402-03 (McNaughton rev. 1961. This principle has been recognized by the Supreme Court of the United States in Namet v. United States, 373 U.S. 179, 83 S. Ct. 1151, 10 L. Ed. 2d 278 (1963). In that case the Court held that it was not error to allow the prosecution to present two witnesses before a jury in a criminal trial even though it was known that the witnesses intended to assert their privilege against self-incrimination in regard to certain of the questions propounded. Although the Court recognized that it might constitute prosecutorial misconduct to present a witness solely for the purpose of creating an inference of guilt to be drawn by the jury from the witness's assertion of his privilege against self-incrimination, the Court held that when a witness is presented in good faith with the expectation that he will be required to answer some of the questions propounded, it is not improper to present such a witness to the jury. Id. at 187-88, 83 S. Ct. at 1155-56, 10 L. Ed. 2d at 284-85. n2 State v. Pari, 430 A.2d 429, 431-433 (R.I. 1981)

Here the trial court specifically rejected allowing the witness, Glen Bogan to testify as to time frames that may have supplied useful information to the jury and supported defense arguments.

This Court has confirmed its holding in Pari in Advisory Opinion to House of Representatives, 469 A.2d 1161, 1165 (R.I. 1983) where this Court reviewed that the U.S. Supreme Court has considered the defendant's right to confront the witnesses against him and state exclusionary rules in Davis v. Alaska and Washington v. Texas. In each case there was a proposal of a complete ban on certain types of evidence. Both times the Supreme Court ruled it improper to ignore so completely the interests of the defendant.

Davis v. Alaska 415 U.S. at 309, 94 S. Ct. at 1107, 39 L. Ed. 2d at 349-50 involved an Alaska state statute that denied the right of a defendant to offer the juvenile record of a witness into evidence. The defendant wanted to use this evidence to impeach the prosecution's star witness by showing bias.

The Court recognized the legitimacy of the state policy of protecting juveniles and their families from embarrassment. Id. at 319, 94 S. Ct. at 111-12, 39 L. Ed. 2d at 355. Yet they held that this consideration was "outweighed by petitioner's right to probe into the influence of possible bias in the testimony of a crucial identification witness." Id. The court in State v. Myers, 115 R.I. 583, 589-90, 350 A.2d 611, 614 (1976), took a similar position, holding that the right to attack the credibility of a witness for the prosecution through the introduction of his juvenile record falls within the constitutional guarantees of the Sixth Amendment and the guarantees of the state constitution.

Davis adhered to therule established earlier in Washington v. Texas, which considered the propriety of a Texas statute forbidding the use of testimony offered by the accomplice of a defendant. The Supreme Court held that this law unduly hampered the ability of a defendant to present a defense:

"The right to offer testimony of witnesses, and to compel their attendance, if necessary, is in plain

terms the right to present a defense. * * * Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to protect his own witnesses to establish a defense. This right is a fundamental element of due process of law." Washington v. Texas, 388 U.S. at 19, 87 S. Ct. at 1923, 18 L. Ed. 2d at 1023. Advisory Opinion to House of Representatives, 469 A.2d 1161, 1165 (R.I. 1983). This Court found that these cases are positive proof that a blanket denial of a defendant's right to raise issues or call witnesses at trial can violate the Sixth Amendment. Advisory Opinion to House of Representatives, 469 A.2d 1161, 1165 (R.I. 1983). The trial justice's termination of questioning once the privilege was asserted was faulted as the court observed that "the assertion of a privilege against self-incrimination does not end the inquiry. It is the function of the trial to determine whether the privilege is properly asserted. In this connection the trial justice cannot defer to fanciful assertions of a privilege by the witness." Id. at 430 A.2d at 432.

The importance of the ability of the trial court to weigh the privileged evidence against the defendant's rights has also been applied to a restrictive rape-victim shield statute. The New Hampshire statute denied any evidence of the sexual history of the victim. State v. Howard, 121 N.H. 53, 58, 426 A.2d 457, 460 (1981), held that this "legislative prohibition of a certain class of evidence, even for the purpose of preventing a witness from suffering embarrassment on the stand, should not limit the Sixth Amendment right of a defendant to confront the witness against him." Advisory Opinion to House of Representatives, 469 A.2d 1161, 1165-1166 (R.I. 1983). The denial of the right to present the witness, Glen Bogan was effectively the denial of the right to present a defense in violation of the Sixth Amendment of the United States Constitution and that such error was not harmless.

## V. IMPOSITION OF TWENTY-FIVE YEAR SENTENCING ENHANCMENT BASED ON JUDGE BASED FINDINGS VIOLATES THE DEFENDANT'S SIXTH AMENDMENT RIGHTS AND THE HOLDING IN BLAKELY.

The trial court imposed a life sentence in this matter as it was required to do upon conviction under R.I. Gen. Laws § 11-23-1 of first degree murder. (T. Sentencing 27) The critical and constitutionally flawed portion of the sentencing occurred when the trial court sentenced the defendant to 25 additional years pursuant to the Habitual Offender statute R.I. Gen. Laws §12-19-21. That statute as it existed at the time of the offense required two determinations by the court.

The first being that the court found the defendant met the required numeric amount of prior felony convictions and that they fit the description required by the statute and declared him to be a habitual offender. (T. Sentencing 12). The court next turned to the discretionary portion of the task and imposed a twenty-five year (25) year sentence which is mandated to be served after the underlying life sentence. (T. Sentencing 35) The twenty-five (25) enhancement to the life sentence imposed for the offense of conviction violates the defendant's rights under the Sixth Amendment to the United States constitution. The sentencing enhancement applied below runs afoul of the holding of the U.S. Supreme Court in Blakely v. Washington 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004). In Blakely, the Court reiterated its holding in Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348, 147 L. E. 2d 435 (2000) that the Sixth Amendment requires that, other than a prior conviction, any fact that increases the penalty for a crime beyond the prescribed "Statutory Maximum" must be proved to a jury beyond a reasonable doubt. Blakely, (542 U.S. at 391-02). The sentencing result here simply cannot be squared with the requirements of Blakely. The sentencing judge under R.I. Gen. Laws §12- 19-21 has virtually unbridled discretion to impose a sentence in addition to the maximum statutory sentence from days to as occurred here the maximum 25 years. The judge must impose some sentence once he finds the statute applies. In State v. Chiellini, 762 A.2d 450, 456 (R.I. 2000) this court held: "In its plain and unambiguous application, § 12-19-21 requires the trial justice to impose an additional period of incarceration upon a criminal defendant if

he or she is found to be a habitual criminal. The actual length of the additional period, whether it be a matter of months or years -- whether it is suspended or ordered to be served -- up to the maximum of twenty-five added years is within the discretion of the trial justice. The unvarnished meaning of the statute requires the trial justice to impose some additional period of incarceration beyond the underlying term when sentencing a habitual criminal. Therefore, we conclude as a matter of law that the trial justice erred in not imposing an additional sentence upon Chiellini after finding him to be a habitual criminal under § 12-19-21." The amount of such sentence is obviously committed to the discretion of the trial justice employing in this instance well known sentencing considerations. "And, essentially, they are the principals of : Incarceration; retribution, which is the just punishment for crimes committed; Deterrence to other members of society who may be similarly situated who may wish for whatever reason to follow a similar criminal course; and Rehabilitation. (T. Sentencing 31) In making its findings the court clearly stated that the two fold principles of Retribution and Incapacitation are certainly being satisfied by the sentence the defendant has received on first degree murder. (Id. at 32) In fashioning its sentence the court goes on to qualitatively weigh recidivism and the defendant's criminal history both before and after the offense date, noting from the time he was twenty years of age (Id. at 33) and also noting through the 70's, 80's, and 90's. (Id at 28 and 33). The Court also found lack of rehabilitation prospects and called such prospects "an absurdity". Id. at 33.

These findings are directly akin to those required of a jury beyond a reasonable doubt set forth in Blakely. Blakely, 542 U. S. at 301-302. Blakely reformulated the definition of "statutory maximum" as "the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant. Blakely, 542 U.S. at 303. Thus, the rule established by the Apprendi line of cases is that "any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or

a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." United States v. Booker 543 U.S. 220, 244, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005).

In Washington v. Recuenco __ U.S.__ 126 S.Ct. 2546, 165 L.Ed. 2d 466 (2006), the United States Supreme Court held that Blakely errors are subject to harmless error analysis. In State of Minnesota v. Dettman, 719 N.W. 644,655 (Minn. 2006) the Supreme Court of Minnesota held that the Blakely error had occurred when the sentencing court ordered an upward sentencing departure based on facts neither found by a jury nor properly admitted by the defendant. Id. The Minnesota Court held that because the erroneous departure increased the length of the defendant's sentence by seventy-two (72) months, and because we cannot say with certainty that jury would have found the aggravating factors used to enhance the defendant's sentence had those factors been submitted to a jury in compliance with Blakely, the Blakely error was not harmless. Id. The case was remanded for resentencing.

Manifestly, the instant sentencing enhancement of twenty-five (25) years over the maximum statutory sentence was based on facts determined by a judge. The trial court referenced four sentencing principles in determining the extent of the enhancement to be imposed: incarceration, restitution, which the court noted is the just punishment for crimes committed, deterrence to other members of society and rehabilitation. Sentencing Transcript P. 31. The court found that the two factors retribution and incapacitation were accomplished by the sentence the defendant received on the first-degree murder. The trial court judged the defendant's prospects for parole as unlikely. Id at P. 32. The court went on to conclude the limited effect courts in general have on deterring others from criminal conduct. Id. at P. 32.

The court focused in then on the lack of rehabilitation prospects posed by the defendant, an inquiry wholly devoid of any participation by the jury or any admission by the defendant. The court then went on to conclude it was free to review the course of criminal conduct of the defendant over

the years since the murder. The court determined it had a wide discretion in considering material for sentencing Id. at 33. The court stated: "And, this Court is considering all of the aspects that have been argued by the State." The court concluded that the defendant had shown a three-decade course of conduct completely in opposition to the societal norms and standards within which most of us try to conduct ourselves through the course of our lives. Id. This finding is a judge made finding. The judge went on to determine that the defendant has not learned from his mistakes. The trial court dismissed serious findings presented by the defense indicating as a mitigating factor a disorder as set out in Army records. Id. at 34. The court concludes that the defendant has a complete disregard for the fabric of society and then imposed the maximum twenty-five (25) year period. Id.

The state will likely claim here as the state did in State of Minnesota v. Henderson, 706 N.W. 2d 758, 761 that this type of determination comes under the recidivism exception to Apprendi and Blakely first recognized in Almendarez-Torres v. U.S., 523 U.S. 224, 118 S. Ct. 1219, 140 L.Ed. 2d 350 (1998), and that therefore it is a question of law. In Almendarez-Torres, the United States Supreme Court considered a federal statute authorizing a two-year prison term for deportees who return to the United States without permission, but authorizing a prison term of up to twenty (20) years for aliens whose deportation was subsequent to a felony conviction. Id. at 226. The question before the court was whether the statute defined two separate crimes, in which case the prior conviction must be mentioned in the indictment, or simply authorized the enhanced penalty, in which case the prior conviction is not an element that must be changed. Id. The court determined that the prior felony conviction was merely a penalty provision that authorized courts to increase the sentence for a recidivism at 229-35. The court noted that recidivism "is a traditional, if not the most traditional, basis for a sentencing court's increasing an offender's sentence. Id. at 243. Therefore, the court held, the fact of a prior felony conviction may be considered by the judge in enhancing a sentence, without being made an element of the offense for which the defendant is sentenced. Id. At

235, 247.

The state here will likely argue as the state did in Henderson that the career offender/habitual offender determination in this case is akin to the determination of prior convictions in the Almendarez-Torres case. The Supreme Court of Minnesota did not agree, State of Minnesota v. Henderson, 70 6 N.W. 758, 761 (Minn. 2005) and it is respectfully submitted this court ought to disagree as well.

As the Henderson court noted, the statute at issue in Almendarez-Torres allowed enhancement based purely on the existence of a previous felony conviction without consideration of any relationship of the previous felony to the deportation violation. The career offender statute is significantly different. Under the career offender statute not only must a judge find that the defendant has a prior felony conviction, but the judge must also look to a variety of prior conduct including felony and gross misdemeanor offenses and prior uncharged acts of criminal conduct and decide what their relationship is to each other and to the conviction for which sentence is being imposed.

As the Minnesota Court of Appeals recently concluded in State v. Mitchell, determination of a pattern of criminal conduct "involves a comparison of different criminal acts, weighing the degree to which those acts are sufficiently similar.... This determination goes beyond a mere determination as to the fact, or number, of the offender's prior convictions....". 687 N.W. 2d 393, 399-400 (Minn. App.), rev. granted and stayed 2004 Minn. The Henderson court went on to hold that the relevant move from Apprendi dictates that other than the fact of a prior conviction, any fact that increases the penalty of a crime beyond the proscribed statutory maximum must be submitted to a jury and proven beyond a reasonable doubt." Apprendi, 530 U.S. at 490. The Apprendi court made it clear that recidivism is a narrow exception to the general rule that all facts going to punishment must be found by a jury. Therefore, the additional findings involved in the comparison and weighing of bad

conduct go beyond the acceptable parameters of the recidivism exception, because they involve more than the fact of prior convictions. Id.

The Minnesota Supreme Court went on to hold that the determination of a pattern of criminal conduct under Minnesota Statute § 609.1095 goes beyond solely the fact of a prior conviction and, therefore, the imposition of enhanced sentence based on the District Court's finding of a pattern of criminal conduct violated Henderson's Sixth Amendment right to a trial by jury. The Minnesota statute which is set forth as Minnesota Statute § 609.1095 is not all that dissimilar to the Rhode Island Statute except in that it gives more parameters to what would enter into the sentencing court's calculus of the additional sentence for the career offender/habitual offender sentence. The Rhode Island statute does not have such parameters in it as it existed of the time of the commission of the offense in 1981, nor for that matter does it currently have those parameters. See Rhode Island General Laws § 1219-21. As this court has noted in State v. Chiellini, 762 A.2d 450, 456 (RI 2000) "the actual length of the additional period, whether it be a matter of months of years....whether it is suspended or ordered to be served....up to the maximum of 25 added years is within the discretion of the trial justice". Presumptively, such a sentence is imposed upon the principles of all criminal sentencing such as the four principles outlined by the trial justice below. Clearly, under all circumstances, the same are based on findings made by the trial justice without the assistance of a jury and therefore, violate the holding in Blakely. See also State v. Allen, 359 N.C. 425, 615 S.E. 2d 256 (2005) opinion withdrawn because of holding in Washington v. Recuenco, U.S. 126 S.Ct. 2546, 165 L.Ed. 2d 466 (2006) and North Carolina v. Speight, 126 S.Ct. 2977 (2006) also remanding that case for further consideration in light of decision in Washington V. Recuenco (harmless error analysis) U.S. 126 S.Ct. 2546 (2006). See Lopez v. People, 113 P.3d 713, 719 (Colo. 2005) We hold that, properly applied, section 18-1.3-401(6) is constitutional. In light of Blakely, section 18-1.3-401(6) aggravated sentencing may rely on at least one of four kinds of facts: (1) facts found by a

jury beyond a reasonable doubt; (2) facts admitted by the defendant; (3) facts found by a judge after the defendant stipulates to judicial fact-finding for sentencing purposes; and (4) facts regarding prior convictions. But See: State v. Natale, 184 N.J. 458, 482-483 (N.J. 2005) Courts in states with sentencing schemes similar to our own have reached varying conclusions regarding the impact of Blakely, supra and Booker, supra [***42] on presumptive sentencing. Some have held that when the jury verdict or guilty plea [**738] authorizes only a presumptive term, an increase in the sentence above the presumptive based on judicial findings violates the Sixth Amendment. See, e.g., Smylie, supra, 823 N.E.2d at 683 (Indiana); see also Brown, supra, 99 P.3d at 17-18 (Arizona); Shattuck, supra, 689 N.W.2d at 786 (Minnesota); Dilts, supra, 103 P.3d at 98-100 (Oregon, in that case only). Others, including the Supreme Court of California, have concluded that there is no Sixth Amendment impediment when a judge increases a sentence above the presumptive term, but within the statutory range, based on discretionary judicial findings. Black, supra, 113 P.3d at 544, 29 Cal. Rptr. 3d at 750; see also Lopez, supra, 113 P.3d at 730-31 (Colorado, when court relies on certain facts) ; Gomez, supra, 163 S.W.3d at 658 (Tennessee) ; Hughes, supra, 110 P.3d at 200, 200 n.3 (Washington, when statute is applied properly) . We reject the California approach because [***43] it appears to be in direct conflict with Blakely, supra. [*483] 542 U.S. at 305 n.8, 124 S. Ct. at 2538 n.8, 159 L. Ed. 2d 403 ("Whether the judicially determined facts require a sentence enhancement or merely allow it, the verdict alone does not authorize the sentence."); see also supra at 479 n. 7, 878 A.2d at 736, n. 7. (underlining added) Clearly under either approach the enhancement facts found by the trial justice do not fit in any of the categories recognized. The were certainly not admitted and they were not found by a jury.

In State v. Natale, 184 N.J. 458, 484 (N.J. 2005) the New Jersey Supreme Court held: “Our Code provisions make clear that, before any judicial factfinding, the maximum sentence that can be imposed based on a jury verdict or guilty plea is the presumptive term. Accordingly, the "statutory

maximum" for Blakely and Booker purposes is the presumptive sentence. Because the Code's system of presumptive sentencing allows judges to sentence beyond the "statutory maximum" based on their finding of aggravating factors, that system is incompatible with the holdings in Apprendi, supra, Blakely, supra, and Booker, supra. We, therefore, conclude that the Code's system of presumptive term sentencing violates the Sixth Amendment's right to trial by jury."

It appears also that the Almendarez-Torres exception is significantly in doubt at this time in that in Shepard v. United States, 544 U.S. ___, 125 S. Ct. 1254 (2005), construing 18 U.S.C. § 924(e) the court held that disputed facts about whether a prior conviction is a violent crime are "too far removed from the conclusive significance of a prior judicial record, and too much like the findings subject to Jones and Apprendi, to....authorized judge to resolve the dispute." Shepard, 125 S.Ct. at 1262. Since Almendarez-Torres v. United States, 523, U.S. 224, 247 (1998), there have been a series of cases holding that sentencing facts which increase the statutory maximum must be proved to a jury beyond a reasonable doubt. United States v. Booker ___U.S.____, 125 S.Ct. 738, 756 (2005) (Opinion of the court by Stevens, J.); Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 2536 (2004); Ring v. Arizona, 536 U.S. 584, 597 n.3 (2002); Apprendi v. New Jersey, 530 U.S. 466, 490 (2000); Jones v. United States, 526 U.S. 227, 243 n.6 (1999) it appears that "a majority of the court now recognize that Almendarez-Torres was wrongly decided," Justice Thomas recently urged that, "in an appropriate case, this Court should consider Almendarez-Torres' continuing viability." Shepard v. United States, ___ U.S. ___, 125 S. Ct. 1254, 1264 (2005) (Thomas, J., concurring), citing 523 U.S., at 248-249, 118 S.Sct. 1219 (Scalia, J., joined by Stevens, Sourter, and Ginsburg, JJ., dissenting); Apprendi v. New Jersey, 530 U.S. 466, 520-521 (2000) (Thomas J., concurring).[27] For Almendarez-Torres to be viewed as tenable safe haven for this

[27] The Apprendi majority also suggested that Almendarez-Torres is limited to its "unique facts", including the defendant's failure to contest the accuracy of the fact of his prior convictions. Id. at 488-489. Here, in contrast, Appellant squarely contested the use of the criminal history following

enhancement appellant would be one of the "innumberable criminal defendants who have been unconstitutionally sentenced under the flawed rule of Almendarez-Torres". Shepard 125 S.Ct. at 1264 (Thomas, J., concurring). It appears clear that Blakely applies to the instant case in that Blakely announced a new rule of constitutional criminal procedure. The Supreme Court of Minnesota found as much in State v. Houston, 702 N.W. 2d 268, 271 (Minn. 2005), reiterated at State of Minnesota v. Osborne, 715 N.W. 2d 436 (2006 Minn.) "we have previously concluded that Blakely announced a new rule of constitutional criminal procedure. Houston, 702, N.W. 2d at 273. New rules of criminal procedure apply retroactively to cases pending on direct review at the time the new rule is announced. O'Meara v. State, 679 N.W. 2d 334, 339 (Minn. 2004). A case is pending on direct review until the time period for filing a certiorari petition with the United States Supreme Court is expired. Id. A petition for certiorari is due within ninety days of entry of judgment. Supreme Court Rule 13(1) Id. The Rhode Island Supreme Court in other criminal cases, has similarly given retroactive effect to newly announced standards applying them to cases pending on direct review. *State v. O'Coin*, R.I. , 417 A.2d 310 (1980). *See Infantolino v. State* **[**12]** , R.I. , 414 A.2d 793 (1980) (applying the newly announced standard relating to burden of proof on the issue of self defense to a case pending on direct review at the time of its promulgation). In *State v. Porter*, R.I. , , 437 A.2d 1368, 1372 (1981), the court observed that its decision to apply a new rule retroactively to a criminal proceeding pending before it on direct review would be influenced by criteria such as those that were articulated in *Linkletter*, 381 U.S. at 636, 85 S. Ct. at 1741, 14 L. Ed. 2d at 612. These included the purpose of the new rule, the extent of reliance on the old doctrine, and **[*17]** the effect of retroactive application on the administration of justice. The court held that the purpose of the new rule is of paramount importance. *Id.* at 636-37, 85 S. Ct. at

---

the date of occurrence of the crime and the extent of the departure proposed by the state for such a criminal history. The facts going into the twenty-five year enhancement were resolved by a judge sitting without a jury and were not by proof beyond a reasonable doubt.

1741-42, 14 L. Ed. 2d at 612-13. Finally, in *State v. Arpin*, 122 R.I. 643, 657, 410 A.2d 1340, 1347-48 (1980), the court collected a number of cases in which the issues of prospectivity and retroactivity were treated. In reviewing those cases, we noted that "in the past this court has chosen to apply new rules of law in the manner best suited **[**13]** to serve the interests of justice and to avoid hardship." See also State v. Natale, 184 N.J. 458, 494 (N.J. 2005) "Pipeline retroactivity"--applying our holding to defendants with cases on direct appeal as of the date of this decision and to those defendants who raised Blakely claims at trial or on direct appeal--best balances principles of fairness and repose. It is respectfully submitted that there is ample reason to apply the new rule created by Blakely to cases pending direct appeal.

**CONCLUSION**

For the aforementioned reasons, it is respectfully submitted that this court reverse the conviction below.

George J. West

George J. West #3052
One Turks Head Place, Suit 312
Providence, RI 02903
Tel. 401-861-9042
Fax. 401-861-0330

CERTIFICATION

I hereby certify that on this 27th day of November, 2006, I forwarded a coy of the within Brief of Appellant Ricardo Ramirez to the Appellate Division, Department of Attorney General, 150 South Main Street, Providence, RI 02903

George J. West

George J. West